IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WARREN HILL, LLC              :        CIVIL ACTION
                              :
          v.                  :
                              :
NEPTUNE INVESTORS, LLC, et al. :        NO. 20-452

MEMORANDUM

Bartle, J.                              December 15, 2020

        Plaintiff Warren Hill LLC ("Warren Hill") has sued

defendants Neptune Investors LLC, AHG Group LLC, AHG Group

Holdings LLC, HFP Investors LLC, Gorovitz Family Limited

Partnership, Gene Harris, and CHGO Real Estate Consulting Group

LLC ("defendants") in this diversity action under the

Pennsylvania Uniform Voidable Transactions Act, 12 Pa. C.S. §

5101 et seq.  Warren Hill claims that SFR Equities LLC ("SFR")

fraudulently transferred assets to defendants so as to undermine

SFR's ability to pay the judgment entered by this court against

it and in favor of Warren Hill in Warren Hill, LLC v. SFR

Equities, LLC, Civil Action No. 18-1228.  Before the court is

Warren Hill's motion for a preliminary injunction against

defendants.

        Warren Hill filed a complaint in the underlying action

against SFR on March 23, 2018 for breach of contract.  Warren

Hill claimed that SFR had violated the terms of the "Membership

1

Interest Purchase Agreement" ("MIPA") between the two parties governing the sale to SFR of Warren Hill's stake in a company called Vendor Assistance Program, LLC ("VAP") by failing to pay Warren Hill the full obligation it owed under the MIPA.

VAP exists because of the inability or unwillingness of the State of Illinois to pay its bills on time.  VAP was established in 2011 as a qualified purchaser to purchase accounts receivable from vendors of the State of Illinois under the Vendor Payment Program ("VPP"), a program instituted by Illinois to ensure its vendors are promptly compensated.  To purchase the accounts receivable, VAP makes use of Delaware statutory trusts.  The State, at some later time, repays the qualified purchaser and includes a substantial interest penalty. After all the fees and expenses are paid regarding the trusts, the trust certificate holder is left with a profit known as "trust certificate income."

Warren Hill sold its interest in VAP to SFR, effective January 1, 2016, in exchange for SFR's agreement pursuant to the MIPA to pay Warren Hill a sum certain plus additional sums based on subsequent events, including a portion of VAP's income and reserve for 2016, 2017, and 2018.  After this sale, VAP established Bluestone Capital Markets ("BCM") and transferred to BCM the trust certificates that VAP previously held.

As noted, Warren Hill brought suit on March 23, 2018

in this court against SFR for breach of contract for failing to pay what it owed Warren Hill under the MIPA.  SFR accepted service of the complaint on March 26, 2018.  On July 23, 2019, this court granted summary judgment in favor of Warren Hill on the issue of liability on the ground that SFR had not paid its full obligation to Warren Hill under the MIPA.  On December 3, 2019, this court granted summary judgment in favor of Warren Hill as to damages and ordered SFR to pay $6,226,688.19 to Warren Hill.  This court also entered declaratory judgment in favor of Warren Hill and ordered SFR to pay 16.623% of all funds, including trust certificate income, for 2016, 2017, and 2018 not yet released by the trusts to VAP.

On January 2, 2020, SFR, the judgment-debtor, filed a notice of appeal, and the action is currently pending before the Court of Appeals for decision.  SFR declined to post a bond. With no bond posted, Warren Hill may seek to satisfy the judgment.  See Fed. R. Civ. P. 62.

Warren Hill brings this present suit to collect the judgment entered in the underlying action.  It alleges that SFR transferred significant assets to defendants, which are all affiliated entities, to avoid paying what is owed.  Warren Hill further claims that as a result of the transfers, SFR was made insolvent.

On November 16 and 17, 2020, the court held an

evidentiary hearing on Warren Hill's motion for a preliminary injunction to compel defendants to set aside assets to protect its judgment against SFR.  The court now makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I.

To obtain a preliminary injunction, a moving party must establish: "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured."  Reilly v. City of Harrisburg, 858 F.3d 173, 176 (3d Cir. 2017).  In addition, the district court must also consider, when relevant, "(3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."  Id.  The first factor requires that the moving party merely make a showing "significantly better than negligible" that it can win on the merits.  Id. at 179.  It does not have to establish that its ultimate success is "more likely than not."  Id.

The court must balance these four factors when deciding whether to grant a preliminary injunction.  Id. at 177-78.  "District courts have the freedom to fashion preliminary equitable relief so long as they do so by 'exercising their sound discretion.'"  Id. at 178-79 (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)).

The Pennsylvania Uniform Voidable Transactions Act ("PUVTA"), 12 Pa. C.S. § 5101 et seq., sets forth when transfers or obligations are voidable as to present or future creditors. Section 5104 of the PUVTA declares that "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor . . . if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay or defraud any creditor of the debtor." 12 Pa. C.S. § 5104(a). The statute sets forth certain factors which the court may consider when determining whether the debtor acted with "actual intent" to commit fraud.[1] 12 Pa. C.S. § 5104(b).

Transfers are also voidable "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." 12 Pa. C.S. § 5105(a).

---

1. Such factors include whether: the transfer was made to an insider; the debtor "retained possession or control" of the transferred property; the transfer or assets were disclosed or concealed; the debtor was threatened with litigation before making the transfer; "the transfer was substantially all of the debtor's assets;" "the debtor absconded;" the debtor received reasonably equivalent value in exchange for the transfer; the debtor was insolvent at the time of transfer or shortly after; the debtor incurred a substantial debt before or shortly after the transfer; and "the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." 12 Pa. C.S. § 5104(b).

The PUVTA includes a choice of law provision whereby "the local law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred" is the governing law for a claim for relief.  12 Pa. C.S. § 5110(b).  When the debtor is an organization, its location is its place of business.  12 Pa. C.S. § 5110(a).

The offices of the judgment-debtor SFR and of all defendants are located in Florida, and all of the transfers in question by SFR to defendants occurred in that state.[2] Therefore, the law of Florida applies in this case pursuant to the PUVTA.

Florida's Uniform Fraudulent Transfer Act ("FUFTA") is identical to the PUVTA in all aspects relevant to this case. Section 726.105 of the FUFTA contains the same provisions related to fraudulent transfers as section 5104 of the PUVTA. Section 726.106 of the FUFTA, like section 5105 of the PUVTA, provides that a transfer is fraudulent "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or

_____

[2]   Gene Harris testified that CHGO also has an office in Puerto Rico, in addition to the Florida office.

obligation."[3]

The FUFTA and the PUVTA specifically provide for injunctive relief.  <u>See</u> Fla. Stat. § 726.108(1)(c)(1); 12 Pa. C.S. § 5107(a)(3)(i).  Section 726.108(1)(c) of the FUFTA states that a creditor may obtain "[s]ubject to applicable principles of equity and in accordance with applicable rules of civil procedure: 1. An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property."  This section of the statute also permits the court to grant "[a]ny other relief the circumstances may require."  Fla. Stat. § 726.108(1)(c)(3).

As this court has previously held, it has personal jurisdiction over the defendants even though the alleged fraudulent transfers at issue occurred in Florida.  As set forth in a memorandum filed May 5, 2020, this court determined that, based on the facts in the record, there are sufficient minimum contacts with Pennsylvania on the part of Gene Harris and the defendants he manages so as to satisfy due process, and any other defendants are so closely affiliated with Harris that due

---

3.   The only slight difference between the PUVTA and the FUFTA in this section is that the PUVTA declares that a transfer is "voidable" if the debtor did not receive reasonably equivalent value in exchange and was insolvent at the time of transfer, while the FUFTA provides that the transfer is "fraudulent" when those same circumstances occur.

process is satisfied.  See Warren Hill, LLC v. Neptune
Investors, LLC, Civil Action No. 20-452 (Doc. #30).

          The judgment against SFR was entered in Pennsylvania
in favor of Warren Hill, whose members are all citizens of
Pennsylvania.  The record establishes that Harris, manager of
defendants AHG Group LLC, AHG Group Holdings LLC, Neptune
Investors LLC, HFP Investors LLC, and CHGO Real Estate
Consulting Group LLC, participated in the transfers at issue,
all the while knowing of the lawsuit against SFR in Pennsylvania
and the subsequent judgments this court entered against SFR in
that matter on July 23, 2019 and December 3, 2019.

          Harris also knew at the time he was negotiating the
MIPA with Warren Hill on behalf of SFR in 2016 that Warren Hill
is based in Pennsylvania.  In addition, David Reape, CEO of VAP,
BCM, Bluestone Finance LLC ("BSF"), and Healthcare Finance LLC
("HCF"), resides and works in Pennsylvania and has done so for a
number of years.  BCM, BSF, and HCF were all involved in some
form with the allegedly fraudulent transfers as BCM received a
loan from SFR, BSF's assets were transferred from SFR to
multiple defendants, and HCF had a loan with SFR that SFR
forgave.  During the course of these transfers, Harris and
defendants, as well as Brian Hynes, owner of BCM, BSF, and VAP,
worked with Reape, whose presence and activity in Pennsylvania
were known to them.

II.

Defendants, as well as SFR, are all affiliated entities within the AHG Group universe.  Gene Harris, Alan Ginsburg, and Aaron Gorovitz are the owners and managers of AHG Group LLC ("AHG Group") which in turn owns and controls Neptune Investors LLC ("Neptune").  Neptune is the parent company and sole owner of SFR.  Thus, Harris, Ginsburg, and Gorovitz are the ultimate beneficiaries of both SFR and Neptune.

AHG Manager LLC ("AHG Manager"), which is not a defendant in this action, is the manager of SFR, Neptune, and the rest of the AHG Group entities.  Harris, Ginsburg, and Gorovitz manage AHG Manager.

HFP Investors LLC ("HFP") is solely owned and managed by Harris.  Gorovitz Family Limited Partnership ("Gorovitz Family") is owned by Gorovitz.  AHG Group Holdings LLC ("AHG Group Holdings") is owned by Ginsburg and managed by Harris, Ginsburg, and Gorovitz.

In addition, Brian Hynes is a business partner of Harris, Ginsburg, and Gorovitz, and partially owns VAP, BCM, and BSF.  SFR also owns interests in VAP and BCM.  Hynes and AHG Manager, by and through Harris, are the managers of CHGO Real Estate Consulting Group LLC ("CHGO").  CHGO was owned equally by SFR and BFH Investments LLC ("BFH") until SFR assigned its interest in CHGO to Neptune.  CHGO in turn owns VAP and BCM.

Warren Hill challenges six transactions made by SFR as fraudulent under the FUFTA and the PUVTA.  The court will address each in turn.

At the hearing before this court, Jeffrey Buchakjian testified as an expert on behalf of Warren Hill.  Buchakjian is a certified public accountant and is certified in financial forensics.  He reviewed bank statements, accounting records, including backup files of defendants' accounting system "Peachtree," deposition testimony, and other documents produced in this matter to form the basis of the opinions he offered in court.  After reviewing these records, Buchakjian opined that SFR did not receive reasonably equivalent value for transferring the assets in question.  In addition, he conducted a solvency analysis and determined that SFR was insolvent as a result of these transfers.

**A. BSF Transfer**

Warren Hill first maintains that SFR fraudulently transferred its 45% interest in BSF to other entities in the AHG umbrella, namely AHG Group Holdings, HFP, and Gorovitz Family, all of which are ultimately owned and controlled by Harris, Ginsburg, and Gorovitz.  AHG Group Holdings received a 25.28% interest in BSF while HFP and Gorovitz Family received a 9.90% interest each.  This transfer occurred on March 28, 2018, two days after SFR accepted service of Warren Hill's complaint in

10

the underlying action.

Harris, in his capacity as manager for AHG Manager, signed the agreement of transfer on behalf of SFR as the assignor and AHG Group Holdings and HFP as two of the assignees. Gorovitz signed on behalf of Gorovitz Family as the third assignee. All three assignees of SFR's interest in BSF are commonly owned and part of the same family of entities. In addition, Hynes signed the agreement in his capacity as manager for CHGO to "consent[] to the admission of Assignees as members" of BSF. Hynes also owns a partial interest in BSF. The agreement stated its effective date as January 1, 2018, though the agreement itself, as noted above, was dated March 28, 2018.

The agreement does not identify any consideration paid to SFR in return for this assignment. Based on Buchakjian's analysis, the value of SFR's interest in BSF was over $6,700,000 in light of the distributions SFR would have received from BSF in 2018 and 2019. Defendants simply counter that SFR received consideration in the amount of $1,825,000 in loan forgiveness from Neptune even though Neptune itself was not a party to this transfer. Moreover, there is nothing in writing to substantiate this loan forgiveness. Defendants maintain that the value of SFR's interest in BSF was not worth more than $1,825,000.

The court finds the testimony of Buchakjian credible that the value of the transferred interest in BSF was $6,700,000

and that SFR received nothing in return.  Again, the evidence establishes that SFR transferred its interest in BSF in an agreement signed March 28, 2018, two days after SFR accepted service of the complaint against it, and that this agreement failed to describe any consideration.  We find not credible that SFR received forgiveness of $1,825,000 in loan from Neptune. Even if it did, the loan forgiveness was not reasonably equivalent.

**B. CHGO Transfer**

Warren Hill next challenges SFR's transfer of its 50% interest in CHGO to Neptune, the parent company of SFR.  The agreement between SFR and Neptune states that the transfer was "for value received" although it does not identify what that value is.  Once again, Harris signed the agreement on behalf of both the assignor, SFR, and the assignee, Neptune.  Hynes and Harris signed the agreement as the management committee of CHGO to consent to the transfer.

The agreement provides that its effective date is January 1, 2018, although it does not state when it was signed. However, the evidence establishes that this transfer was not entered into Neptune's accounting records until August 3, 2019. Conversations among Harris, Hynes, and Alan Wilson, CFO of BSF and paid consultant for other AHG entities, confirm that SFR continued its ownership of CHGO well into 2019.  We find that

12

the actual date of transfer was August 3, 2019.  It occurred

shortly after July 23, 2019, when this court granted summary

judgment on liability in favor of Warren Hill and against SFR in

the underlying action.

Buchakjian determined the value of SFR's interest in

CHGO that it transferred to Neptune to be approximately

$6,250,000.  He based this number on a previous undated transfer

of a 6% interest in CHGO from SFR to BFH in which SFR and BFH

valued a 6% interest in CHGO at $753,000.  Thus, if 6% of CHGO

was worth $753,000, it was proper to find that 50% of CHGO was

worth at least $6,250,000.  We find Buchakjian's method of

valuation as well as his valuation to be reasonable and

acceptable.

In exchange for SFR's interest in CHGO, Buchakjian

found that SFR received nothing of value from Neptune.  He

opined that all SFR ostensibly received was Neptune's future

promise to make available to CHGO $400,000 in cash.  This amount

has not been forthcoming.

Defendants argue that SFR received a value of

$2,200,000 for this transfer.  This is based on a promise of

$2,000,000 in future capital contributions from Neptune to CHGO

and a value of $200,000 for below-market interest loans from

CHGO to SFR.  This commitment of future cash contribution to SFR

is not memorialized in any agreement and instead was merely

based on a conversation between Harris and Hynes.

The court finds the testimony of Buchakjian credible that the value of SFR's interest in CHGO was worth approximately $6,250,000 at the time of the transfer and that there was no consideration in return.  The consideration on which defendants rely is a mirage.

**C. Consulting Fees**

This court also finds that BCM paid consulting fees to SFR for the last quarter of 2018 and for the first two quarters of 2019.  BCM is owned in part by Hynes and SFR.  In September 2019, BCM stopped paying SFR such fees and instead began making quarterly payments of $25,000 to AHG Manager instead.  As noted above, this court granted summary judgment against SFR as to liability on July 23, 2019, only weeks before BCM began directing its consulting fees to AHG Manager rather than SFR.

The CEO of BCM, David Reape, testified at his deposition on August 24, 2020 that the switch in making these payments to AHG Manager rather than SFR was not made pursuant to any agreement and that he was not sure why these fees were now going to AHG Manager rather than SFR.  Reape could not recall any discussions on the matter.  Harris testified that these fees were a reimbursement for costs that AHG Manager incurs that SFR does not.  This explanation is not credible.

We find that BCM had no legitimate reason to transfer

14

$100,000 in quarterly consulting fees for the last two quarters of 2019 and first two quarters of 2020 to AHG Manager rather than paying these fees to SFR.  SFR did not receive reasonably equivalent value in consideration for the loss of these fees.

### D. BCM Loan

On October 10, 2019, between the time of this court's finding of liability against SFR on July 23, 2019 and before the entry of a judgment for damages on December 3, 2019 against SFR, SFR loaned BCM $2,000,000 "for value received".  Reape, CEO of BCM, testified at his deposition that this was part of refinancing a loan with Bridgeview Bank so that BCM would owe SFR rather than Bridgeview.  Harris and Hynes were guarantors of the Bridgeview Bank loan.  Following this loan to BCM, SFR had just under $15,000 in cash listed in its account.  Harris claims that Hynes had approached him about this loan to provide BCM with capital and that negotiations were orally conducted between himself and Hynes.

BCM has not yet paid any interest or principal on the loan, which matures on December 31, 2022, because it is purportedly letting the payments on the principal and interest accrue.  Reape testified that this was at the request of SFR and Harris that BCM not make payments until the loan matures.

This court finds that SFR did not make a bona fide loan to BCM.  SFR did not receive reasonably equivalent value in

exchange for its so-called $2,000,000 loan.

### E. HCF Debt

In December 2019, around the time that this court
entered summary judgment on damages against SFR, SFR forgave a
loan it had extended to HCF for $530,000.  Reape, CEO of HCF at
that time, testified that HCF made the decision in early 2019 to
dissolve and wind down its liabilities.  The only liability it
did not pay, however, was its loan from SFR.  Reape stated that
this was because HCF did not have enough income to pay the loan.

Harris testified that either he or Hynes told Reape
that HCF would not be able to repay its debt to SFR and that HCF
would not need to make a capital call for funds due to lack of
contributions available to cover the debt.  Harris came to this
conclusion after a conversation with Hynes.

We find this explanation not to be credible.  SFR
simply forgave and thus transferred to HCF $530,000 without any
consideration.

### F. Administrative Fees or Distributions to Neptune

Finally, beginning March 1, 2018 and over the course
of 2018 and 2019 in at least seven installments, SFR paid its
parent company, Neptune, $720,000.  SFR labeled these payments
to Neptune as "administrative fees" in its general ledger, but
it labeled the payments as "distributions" on the check stubs to
Neptune in its own accounting records.  There is no written

16

agreement in the record that forms the basis of any of these payments.  Nor does the record show anything that SFR received of value in exchange for these payments to Neptune.  We find that SFR gave away these funds without receiving reasonably equivalent value.

### G. Solvency

The parties are in agreement that subsequent to the BSF and CHGO transfers, SFR had approximately $11,191,000 in assets.  The parties, for the purposes of a solvency analysis, agree that these two transfers took place as of January 1, 2018.

As for liabilities, Buchakjian determined that SFR had approximately $17,118,324 in liabilities.  This amount is broken down as follows:

| | |
|---|---|
| Neptune Investors LLC Loan | $4,920,000 |
| Warren Hill Obligation | $9,400,000 |
| Deferred Taxes | $2,798,324 |
| **Total:** | **$17,118,324** |

The amount of the Neptune loan to SFR is identified in defendants' own accounting records.  Defendants do not dispute this amount.  Harris provided the deferred taxes amount as a liability in his affidavit when he performed his own solvency analysis as of January 1, 2018.

Buchakjian determined SFR's $9,400,000 obligation to

Warren Hill based on the December 31, 2017 consolidated audited financial statement of VAP, BSF, and BCM which recorded as a receivable asset $21,515,898 in anticipated trust certificate income that they expected to collect.  VAP would then pay SFR, one of its owners, a portion of this trust certificate income. SFR was then obliged under the MIPA to pay to Warren Hill a percentage of that income.  As VAP fully expected to receive the income from the trust certificate, Buchakjian relied on this figure in determining SFR's income from VAP and its subsequent obligation to Warren Hill as of January 1, 2018 for a total of $9,400,000.  We find his testimony in this regard to be credible.  To the extent that defendants' expert, Kevin Couillard, reaches a different result, we find his testimony not credible.

Based on Buchakjian's conclusions as to SFR's assets, valued at $11,191,000, on which all parties agree, and SFR's liabilities for the Neptune loan in the amount of $4,920,000, its liability to Warren Hill in the amount of $9,400,000, and its liability for deferred taxes in the amount of $2,798,324, he opined that SFR had excess liabilities of $5,927,324 as of January 1, 2018.

Defendants argue that the $2,798,324 in deferred taxes should not be included as a liability.  Defendants' expert would disregard the deferred taxes amount as a liability of SFR since

SFR is a disregarded pass-through entity for tax purposes and thus cannot incur deferred taxes as a liability.  However, Harris, SFR's own manager, included these deferred taxes as part of SFR's liabilities in his own solvency analysis.  Even assuming that the deferred taxes should not be reported as a liability, this court finds that SFR was still insolvent as of January 1, 2018 since its liabilities absent the deferred tax liability are in excess of its assets by $3,129,000.

This court finds Buchakjian's conclusions credible that SFR was insolvent as of January 1, 2018 subsequent to the BSF and CHGO transfers and prior to the other four transactions at issue.  To the extent that defendants and their expert present contrary figures, this court finds that evidence not credible.  Accordingly, this court finds that SFR did not receive reasonably equivalent value for the above transfers of assets and that SFR was insolvent as a result of these transfers.

III.

Based on the court's findings of fact, Warren Hill is entitled to preliminary injunctive relief.  Warren Hill has proven by a preponderance of the evidence that, pursuant to section 726.106 of the FUFTA, it has a reasonable probability of success in this lawsuit, that is that SFR made the above-described fraudulent transfers and that SFR was insolvent as a

19

result.  As Warren Hill has made a sufficient showing under section 726.106, we need not determine whether there was actual intent to defraud under section 726.105, although a number of the factors to establish "actual intent to hinder, delay, or defraud" have clearly been met.[4]

Warren Hill has also shown that it would be irreparably harmed if it cannot collect the judgment in the underlying matter.  The Court of Appeals has explained that "the unsatisfiability of a money judgment can constitute irreparable injury."  Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 206 (3d Cir. 1990).  Even though SFR, the judgment-debtor, is not a party to this action, defendants are entities affiliated with SFR and received assets without giving SFR reasonably equivalent value in exchange for these assets.  Furthermore, SFR was insolvent as a result of these transfers.

The FUFTA includes a provision for injunctive relief against the debtor or the transferee in the event of fraudulent

---

4.   Specifically, all of the alleged transfers were made to affiliated entities of SFR, and therefore the owners and managers of SFR continued to retain possession and control over the assets.  Despite the effective dates of the agreements, evidence demonstrates that these transfers were implemented after Warren Hill served its complaint against SFR in the underlying action.  As a result of these transfers, SFR was insolvent and therefore had transferred substantially all of its assets.  Additionally, as found above, SFR did not receive reasonably equivalent value in consideration for the transfers of these assets.

transfers of assets so that the creditor can collect debts owed

to it.  There is no doubt that defendants participated in the

fraudulent transfers of assets under the circumstances presented

here.  This misconduct is sufficient to justify injunctive

relief to prevent any future mischief on their part to escape

from responsibilities for the judgment in the underlying action.

See Elliott v. Kiesewetter, 98 F.3d 47, 54 (3d Cir. 1996).  It

is the court's view that there is a reasonable likelihood that

without injunctive relief defendants will dissipate assets and

cause harm to Warren Hill by preventing Warren Hill from

collecting on the judgment in the underlying matter.  Id. at 58.

As to the third factor enumerated in Reilly v. City of

Harrisburg, any potential harm to defendants as a result of this

injunction does not outweigh the harm from further dissipation

of assets to avoid paying the underlying judgment.  See 858 F.3d

at 176.  The court will permit defendants to minimize disruption

of their businesses by posting a bond.  If defendants are

unwilling or unable to do so, the court's injunction will

restrain defendants from selling or alienating assets.  The

freeze order will not encumber more assets than necessary to

satisfy the underlying judgment.

Finally, the injunction to be entered also furthers

the public interest in that it seeks to preserve assets to

satisfy a judgment of this court and uphold the court's ability

to enforce that judgment.

IV.

It is within the sound discretion of this court to
fashion preliminary equitable relief.  See Reilly, 858 F.3d at
178-79.  In enjoining the transfer or use of assets to protect a
monetary judgment, we seek "reasonably to relate the value of
the assets encumbered to the likely value of the expected
judgment."  Hoxworth, 903 F.2d at 198.

The FUFTA provides that "the creditor may recover
judgment for the value of the asset transferred . . . or the
amount necessary to satisfy the creditor's claim whichever is
less."  Fla. Stat. § 726.109(2).  The judgment may be entered
against the transferees of the asset.  Fla. Stat. §
726.109(2)(a).

As previously noted, this court finds that SFR's 45%
interest in BSF which it transferred to AHG Group Holdings, HFP,
and Gorovitz Family was worth $6,700,000.  SFR's 50% interest in
CHGO which it transferred to Neptune was worth approximately
$6,250,000.  The diversion of consulting fees from BCM to AHG
Manager rather than to SFR was worth $100,000 for the last two
quarters of 2019 and first two quarters of 2020.  SFR's loan to
BCM was worth $2,000,000.  The loan to HCF that SFR forgave was
valued at $530,000.  Finally, SFR's distributions to Neptune
over the course of 2018 and 2019 totaled $720,000.  The sum

value of the assets SFR transferred is approximately $16,300,000.

The parties do not dispute that on December 3, 2019 this court awarded a judgment in favor of Warren Hill, the judgment-creditor, in the amount of $6,226,688.19.  This court also entered a declaratory judgment and ordered SFR to pay Warren Hill 16.623% of the reserve amount, including trust certificate income, that had not yet been released.  Warren Hill's claim to $2,114,997.98 as 16.623% of the trust certificate income for 2018, as recorded in the consolidated audited financial records for VAP, BCM, and BSF dated December 31, 2018, is a reasonable estimation of the declaratory judgment entered in the underlying action.

In addition to the amount awarded by this court, defendants do not dispute Warren Hill's claim to post-judgment interest in the amount of $97,260.87 for the time period from this court's December 3, 2019 order awarding damages until now, as well as $84,682.96 in post-judgment interest from now until the potential end of this litigation in September 2021.  Thus, Warren Hill seeks a total of $181,943.83 in post-judgment interest in the underlying action.

Warren Hill also seeks pre-judgment interest on a potential judgment in this pending action in the amount of $552,630.40 for interest already accrued and $502,391.27 for

interest through the duration of this litigation.  Additionally, Warren Hill requests that the injunction include fees and costs associated with the underlying litigation pursuant to the terms of the MIPA in the amount of $1,706,159.26 and $600,000 in fees and costs for this present action.  However, even if Warren Hill is ultimately entitled to all of these amounts for pre-judgment interest in this action or fees and costs in both actions, it did not seek these amounts in its motion for a preliminary injunction and did not present evidence to support these figures at the recent hearing.  All Warren Hill did was file a post-hearing affidavit as to these amounts, which defendants did not have a proper opportunity to challenge.  Therefore, the court will not include these amounts as part of the relief to be ordered.

Warren Hill brought this suit to recover the judgment in the underlying action.  Therefore it is reasonable to find that the likely value of the expected judgment in this action relates to the value of the total underlying judgment against SFR, that is the award for damages in the amount of $6,226,688.19, the award for the declaratory judgment in the amount of $2,114,997.98, and the total post-judgment interest for the underlying litigation in the amount of $181,943.83. These figures total $8,523,630.

Since this total is less than $16,300,000, the value

24

of the assets transferred, the court will enter an injunction freezing defendants' assets in the amount of $8,523,630 pursuant to section 726.109(2) of the FUFTA. As noted, the court will permit defendants to file a security bond in lieu of a freeze on its assets.

Defendants argue that this injunction should not be entered against all defendants because not all defendants were recipients of all of the transfers. This argument is without merit. All defendants are beneficiaries in some way from these transfers as members of the transferees. Defendants AHG Group Holdings, HFP, and Gorovitz Family were all recipients of the BSF transfer. In addition, Harris owns HFP and thus personally benefitted from that transfer.

Neptune was a recipient of SFR's interest in CHGO and SFR's distributions, so it is properly enjoined. AHG Group is the sole member of Neptune, so it also benefitted from SFR's transfer of interest in CHGO, as did Harris who has an indirect ownership interest in AHG Group. Finally, CHGO has an ownership interest in BCM, which received the $2,000,000 loan from SFR, so it is a beneficiary of that transaction. Accordingly, all defendants are so intertwined so as to have benefitted from some, if not all, of the six transfers at issue. Therefore, a preliminary injunction against all defendants, jointly and severally, is equitable.

V.

Rule 65(c) of the Federal Rules of Civil Procedure requires that a court issue a preliminary injunction only if the movant "gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  This provision, also known as a bond requirement, is to be strictly interpreted although "the amount of the bond is left to the discretion of the court."  Hoxworth, 903 F.2d at 210.

Warren Hill has agreed to post a bond equal to the cost of defendants' bond premium which it approximates to be about 2% of the total amount of the assets enjoined.  This sum is reasonable.  As this court will enter a preliminary injunction to protect its judgment in the underlying action in the amount of $8,523,630, defendants' estimated bond premium for this amount would be approximately $170,000.  Accordingly, Warren Hill will be required to post a bond in this amount.